AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

<table>
<tr><td>

UNITED STATES OF AMERICA

v.

HOMERO L. DIAZ, MANUEL MARTINEZ-
LUGO, APOLINAR MENA, KORA
FRANCISCO-PLACENCIA, ANTONIO
DEJESUS-SANTANA, JAIME GOMEZ-LOPEZ,
and DANIEL VARELA-MACIAS,

Defendants

</td><td>



Case No.    2:22-mj-01091-duty

**FILED**
CLERK, U.S. DISTRICT COURT

March 17, 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ch___ DEPUTY

</td></tr>
</table>

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 16, 2022, in the county of Ventura in the Central District of California, the

defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Patrick J. Hazelwood*
*Complainant's signature*

Patrick J. Hazelwood, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    March 17, 2022



_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Paul L. Abrams, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Alexander Robbins – 213-894-2400

## AFFIDAVIT

I, Patrick J. Hazelwood, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against **HOMERO L. DIAZ** ("**DIAZ**"), **MANUEL MARTINEZ-LUGO** ("**MARTINEZ**"), **APOLINAR MENA** ("**MENA**"), **KORA FRANCISCO-PLACENCIA** ("**FRANCISCO**"), **ANTONIO DEJESUS-SANTANA** ("**DEJESUS**"), **JAIME GOMEZ-LOPEZ** ("**GOMEZ**"), and **DANIEL VARELA-MACIAS** ("**VARELA**"), for violating 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.   This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "**TARGET DEVICES**") in the custody of the Drug Enforcement Agency ("DEA") in the Central District of California, as described more fully in Attachment A:

a.   One locked blue iPhone inside a clear case assigned call number 661-546-0977, used by **DIAZ** and seized from the top center console of the vehicle used by **DIAZ, MARTINEZ,** and **MENA** when they were arrested ("**TARGET DEVICE 1**");

b.   One locked gray iPhone with a cracked screen, seized from **MARTINEZ'**s person when he was arrested ("**TARGET DEVICE 2**");

c.   One locked red iPhone with crack on back of phone, seized from **MENA'**s person when he was arrested ("**TARGET DEVICE 3**");

d.   One locked yellow iPhone inside clear and black case, seized from **FRANCISCO**'s person when he was arrested ("**TARGET DEVICE 4**");

e.   One black Samsung cell phone, with IMEI number 357816330460450, seized from front driver's seat of the vehicle used by **FRANCISCO** and **DEJESUS** when they were arrested ("**TARGET DEVICE 5**");

f.   One locked gold Samsung J7 Galaxy Prime cell phone in a black case with a cracked screen, seized from the driver's side door of the vehicle used by **DIAZ**, **MARTINEZ**, and **MENA** when they were arrested ("**TARGET DEVICE 6**");

g.   One locked dark blue iPhone, seized from **VARELA**'s person when he was arrested ("**TARGET DEVICE 7**");

h.   One blue Alcatel flip phone, seized from the passenger floorboard of the vehicle used by **GOMEZ** and **VARELA** when they were arrested ("**TARGET DEVICE 8**");

i.   One locked gray TCL smart phone, with IMEI number 016000001671850, seized from the driver side floorboard of the vehicle used by **GOMEZ** and **VARELA** when they were arrested ("**TARGET DEVICE 9**"); and

j.   One locked black Samsung smart phone with a cracked screen, seized from the driver side floorboard of the vehicle used by **GOMEZ** and **VARELA** when they were arrested ("**TARGET DEVICE 10**").

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute

2

controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Target Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.

5.   This affidavit is intended to show only that there is probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.

6.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  Further, unless stated otherwise, all dates and amounts in this affidavit are approximations, and the words "on or about" and "approximately" are omitted for clarity.

## II. BACKGROUND OF AFFIANT

7.   I am a Special Agent ("SA") with the DEA and have been so employed since October 2018.  I am currently assigned to the Ventura Resident Office.  Prior to my current assignment, I was assigned to the Los Angeles Field Division Office Enforcement Group 4.  To become a DEA SA, I attended the DEA Academy in Quantico, Virginia, for approximately four months.  I have received hundreds of hours of training in various investigative techniques, including specialized training in the recognition

3

and processing of controlled substance identification, the methods and means of narcotics violators, narcotics packaging, narcotics paraphernalia and terminology, narcotics prices, field testing of narcotics, interview and interrogation techniques, surveillance techniques, undercover operations, confidential source management, and the effects of controlled substances on abusers.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

8.   In February of 2022, two DEA Confidential Sources communicated with **HOMERO L. DIAZ** ("**DIAZ**") at the telephone numbers assigned to **TARGET DEVICE 1** and set up a meeting with **DIAZ** to buy drugs.

9.   On February 10, 2022, one Confidential Source met **DIAZ** at a parking lot in Fillmore, California.  At that meeting, **DIAZ** sold the Confidential Source approximately 2,000 "M30" pills of suspected fentanyl and approximately one pound of suspected methamphetamine for $4,900.

10.  In a second meeting, on February 23, 2022, in Thousand Oaks, California, **DIAZ** sold the Confidential Source approximately 3,000 "M30" pills of suspected fentanyl for $5,400.

11.  In a third meeting, on March 16, 2022, in Camarillo, California, **DIAZ** and Confidential Source arranged a larger deal, in which **DIAZ** would sell the Confidential Source approximately $236,250 of fentanyl and methamphetamine.  This time, **DIAZ** arrived at the meeting with six other people: **MANUEL MARTINEZ-LUGO** ("**MARTINEZ**"), **APOLINAR MENA** ("**MENA**"), **KORA FRANCISCO-**

4

PLACENCIA ("**FRANCISCO**"), **ANTONIO DEJESUS-SANTANA** ("**DEJESUS**"),
**JAIME GOMEZ-LOPEZ** ("**GOMEZ**"), and **DANIEL VARELA-MACIAS**
("**VARELA**").  **DIAZ** arrived in a black Mitsubishi Eclipse with
**MARTINEZ** and **MENA**; **FRANCISCO** and **DEJESUS** arrived in a white
Dodge Challenger with approximately 50,000 "M30" pills of
suspected fentanyl; and **GOMEZ** and **VARELA** arrived in a silver
Dodge Journey with approximately 45 pounds of methamphetamine.
All seven individuals were arrested, and the **TARGET DEVICES** were
seized from their vehicles and their persons.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.  Based on my review of law enforcement reports,
conversations with other law enforcement officers, and my own
knowledge of the investigation, I am aware of the following:

<u>**Initial Communications**</u>

13.  During the month of February 2022, narcotics
investigators from the Ventura County Combined Agency Team
("VCAT") and the DEA began a narcotics investigation into **DIAZ**,
who according to a DEA Confidential Source ("CS1")[1] sells illegal

---

[1] CS1 has been providing information and assistance to the
local law enforcement and DEA investigators since May 2021.  CS1
has a criminal history consisting of prior felony convictions
for theft, burglary, and possession of a controlled substance.
CS1 also has prior misdemeanor convictions for assault, vehicle
prowl, trespass, and driving under the influence.  CS1 is
currently providing information and assistance after being
charged federally with possessing with intent to distribute a
controlled substance.  CS1 has provided valuable and reliable
assistance to investigators in multiple drug trafficking
investigations.  CS1 has provided information regarding drug
trafficking that was later corroborated by further
investigation.  CS1 has not provided any information that was
later determined to be false or otherwise unreliable.  Based on
CS1's prior performance in drug-trafficking investigations, I
believe that CS1 is a reliable source of information regarding
drug traffickers.

drugs and uses a cellular telephone with the number 661-546-0977, the number assigned to **TARGET DEVICE 1**. **DIAZ** is believed to reside in Bakersfield, California, and according to CS1 is responsible for coordinating the distribution of bulk amounts of fentanyl pills, multiple-pound quantities of methamphetamine, and multi-kilogram quantities of cocaine to the greater Southern California area.

14.   According to phone company records subpoenaed on February 7, 2022, the listed address for **TARGET DEVICE 1** was 3524 Sesame Street, Bakersfield, California, under the name D.M. The email address linked to the telephone account was homerodiaz@gmail.com. **DIAZ** is listed in California DMV vehicle-registration records as living at that same address on Sesame Street in Bakersfield, and is listed as the registered owner of a silver BMW sedan bearing California license plate number 6YRL470.

15.   On February 6, 2022, at the direction of investigators, CS1 communicated with the user of **TARGET DEVICE 1**, believed to be **DIAZ**. The user of the number assigned to **TARGET DEVICE 1** is known to CS1 as "Homero" and a distributer of different types of drugs. During the communications, CS1 told **DIAZ** that CS1's uncle was looking for "waters" and "30s," to which **DIAZ** responded that the pills would cost between $1.50 and $2.00 each. Based on my training and experience, I know that "waters" and "30s" are coded language referring to methamphetamine and M30 fentanyl pills, respectively. **DIAZ** did not quote a price for the methamphetamine at that time. CS1

then asked to pass on to **DIAZ** the phone number of CS1's uncle, and **DIAZ** agreed.

16.   On February 7 and 8, 2022, a second DEA Confidential Source ("CS2"),[2] acting as CS1's uncle, communicated with **DIAZ** at **TARGET DEVICE 1** to further negotiate a drug deal.  During these communications, **DIAZ** used the phone number assigned to **TARGET DEVICE 1** to send CS2 pictures of suspected M30 fentanyl pills and agreed to sell CS2 2,000 pills at the price of $1.80 per pill.  CS2 later provided **DIAZ** an address for a Vons grocery store -- 636 Ventura Street -- in Fillmore, California, where the two agreed to meet to complete the drug deal on the following day.

**February 10 Meeting**

17.   On February 9, 2022, at the direction of investigators, CS2 contacted **DIAZ** at **TARGET DEVICE 1**'s number to confirm the deal.  During the communications, **DIAZ** informed CS2 that he could not meet because of a doctor's appointment but wanted to reschedule the deal for the following day.  Also, during the communications, **DIAZ** offered to sell CS2 a pound of crystal methamphetamine for $1,300 and sent a picture of the methamphetamine to CS2.  CS2 agreed to meet **DIAZ** the following day to purchase both the 2,000 pills and the pound of methamphetamine.

---

[2] CS2 is being paid to assist law enforcement.  CS2 has been working with the DEA since approximately 2010.  CS2 has been charged but not convicted for the following crimes: conspiracy, smuggling, violation of entry requirements, and battery on/against a spouse.  CS2 has provided information in the past that has been corroborated and led to the seizure of narcotics.

18.   On February 10, at approximately 10:30 a.m.,  VCAT Detective Christian Freede and I met with CS2.  During this meeting, Detective Freede and I searched CS2 and CS2's vehicle for contraband, finding none.  I then outfitted CS2 with an audio recording and transmitting device as well as two audio/video recording devices, one of which failed to operate. Detective Freede and I provided CS2 with $4,900 to buy the drugs from **DIAZ.**

19.   Detective Freede and I then escorted CS2 to the Vons parking lot in anticipation of the pending drug deal, where other DEA and VCAT investigators had already set up surveillance.  CS2 was kept in constant observation while traveling to the meeting location.

20.   At 11:05 a.m., CS2 was instructed to call **DIAZ** at **TARGET DEVICE 1** and ask for an estimated time of arrival. During the call, **DIAZ** stated he was coming from the downtown Los Angeles area and gave an estimated time of arrival of one hour. At approximately 11:45 a.m., CS2 called **DIAZ** again and received an estimated time of arrival of 45 minutes due to traffic.  At approximately 12:30 p.m., the CS called and **DIAZ** and was told that **DIAZ** had just gotten onto the 126 Freeway and was driving a black Yukon Denali.

21.   At 12:44 p.m., from the number of **TARGET DEVICE 1,** **DIAZ** called CS2 and informed CS2 that he had arrived at the parking lot.  CS2 provided **DIAZ** with instructions on where to go.  Investigators then observed CS2 leave CS2's vehicle and walk towards **DIAZ'**s vehicle, which parked near CS2's vehicle.

Detective Garnier conducted a record's check on the vehicle and learned that it was registered to J.F.C. with a listed address on Clara Street in Bell Gardens, California 90201. Investigators then observed CS2 go back inside CS2's vehicle, while **DIAZ** got out of his vehicle and walked up to the passenger door of CS2's vehicle carrying a dark-colored bag. **DIAZ** then entered CS2's vehicle. Investigators used digital cameras to record the meeting.

22. At approximately 12:50 p.m., investigators observed **DIAZ** leave CS2's vehicle with the bag and reenter his vehicle. Investigators then began following **DIAZ**.

23. At 1:01 p.m., CS2 was escorted away from the meeting location by investigators. Investigators took custody of a plastic bag from the rear passenger seat of CS2's vehicle. The bag contained two clear plastic baggies, each with multiple blue pills inside, and a clear plastic vacuum-sealed package containing suspected methamphetamine. Investigators took photos of these items as they found them and collected the audio/video devices from CS2. Investigators subsequently searched CS2 and CS2's vehicle for additional contraband, with negative results. Investigators also took possession of the digital recording devices.

24. Meanwhile, other investigators followed **DIAZ** as he drove away toward the 126 Freeway. They followed him as he drove to the city of Los Angeles and parked near 1223 South Atlantic Blvd., at the "Barber's Lounge." Investigators observed **DIAZ** leave his vehicle and walk inside The Barber's

9

Lounge.  After approximately 45 minutes, they saw **DIAZ** leave the Barber's Lounge and return to his vehicle.  They then followed **DIAZ** to the Commerce Casino in the city of Commerce, California, where he arrived a few minutes after 3:30 p.m.  At that point the surveillance ended.

25.  CS2 was debriefed about the drug transaction and told investigators that **DIAZ** had come over to CS2's vehicle carrying a bag and entered on the passenger side, and that inside **DIAZ**'s bag CS2 saw methamphetamine and pills.  After confirming the drugs were there, CS2 placed the drugs in the back seat of CS2's vehicle.  CS2 then opened the center console and handed **DIAZ** a plastic chewing-gum container that contained the agreed-upon money.  **DIAZ** then counted the money and the two of them talked about buying and selling drugs, with **DIAZ** saying that he could provide cocaine, marijuana, methamphetamine, and pills, including a type of pill that's worth $40 each.

**DIAZ's New Phone Number and Location Warrant**

26.  On February 15, 2022, at approximately 1:20 p.m., CS2 received a phone call from 323-481-5965.  The caller identified himself as **DIAZ** and told CS2 that the number he was calling from was his new number.  Also during the call **DIAZ** indicated to CS2 that he is still using **TARGET DEVICE 1** but would prefer to use this other number for future business.

27.  On February 22, 2022, Magistrate Judge Patricia Donahue, in case number 22-mj-708, signed a warrant authorizing the disclosure of historical and prospective cell-cite information and GPS information for **TARGET DEVICE 1** and the

device assigned to the 323-481-5965 number.  I began receiving
GPS location data the next day, on February 23, 2022.  According
to the GPS data received between the dates of February 23, 2022
and March 13, 2022, both **TARGET DEVICE 1** and the other device
frequently displayed a location within approximately 500 meters
of **DIAZ**'s home address on Sesame Street in Bakersfield,
California.

**February 23 Meeting**

28.  On and before February 23, 2022, CS2 communicated with
**DIAZ** via phone calls and texts messages to negotiate a second
drug deal.  **DIAZ** used **TARGET DEVICE 1** to communicate with CS2.
During these communications, **DIAZ** agreed to sell CS2 3,000 pills
at the price of $1.80 per pill.  CS2 later provided **DIAZ** an
address in Thousand Oaks, California, where the two agreed to
meet for a drug deal on February 23, 2022.

29.  On February 23, 2022, at 10:55 a.m., SA Drew Kalies
and VCAT Detective Christian Freede met with CS2 at a neutral
location.  During this meeting, SA Kalies and Detective Freede
searched CS2 and CS2's vehicle for contraband, with negative
results.  SA Kalies then outfitted CS2 with an audio recording
and transmitting device as well as two audio/video recording
devices.  SA Kalies and Detective Freede also provided CS2 with
$5,400 of DEA/VCAT funds for the purchase of the narcotics from
**DIAZ**.  At approximately 10:45 a.m., the surveillance team set up
around the parking lot of Starbucks located at 975 Broadbeck
Drive in Thousand Oaks, California, the intended meeting
location for the drug deal.  At approximately 11:05 a.m., SA

11

Kalies and Detective Freede arrived with CS2 at the Starbucks parking lot.  CS2 was kept in constant observation while traveling to the meet location.  For approximately ten minutes between 11:18 a.m., and 11:28 a.m., CS2 contacted **DIAZ** multiple times to provided CS2's location, which **DIAZ** was having difficulty finding.

30.  At 11:34 a.m., Detective Jose Torres observed a silver BMW sedan bearing California license plate number 6YRL470 arrive at the Starbucks parking lot and park near CS2's vehicle. Detective Torres saw that **DIAZ** was driving, and that with him was a Hispanic female whom investigators did not recognize. Detective Torres then saw CS2 leave CS2's vehicle and flag down **DIAZ**.  CS2 walked towards **DIAZ**'s vehicle, which parked near CS2's vehicle, and CS2 then returned to CS2's vehicle; **DIAZ** left his vehicle and entered the passenger side of CS2's vehicle.

31.  At 11:44 a.m., Detective Torres saw **DIAZ** leave CS2's vehicle, walk back towards **DIAZ**'s vehicle and talk to the female passenger in his vehicle.  She then got out of the vehicle and walked with **DIAZ** to a nearby Jamba Juice.

32.  While inside the Jamba Juice, **DIAZ** was seen in front of the store, having a conversation with an unknown Hispanic male wearing a dark-colored shirt, a black jacket, and blue jeans.  At 12:02 p.m., Detective Torres observed **DIAZ** and the female walk back and enter **DIAZ**'s vehicle.

33.  At 12:07 p.m., **DIAZ** drove away from the parking lot meeting location in the silver BMV, which investigators followed as it drove toward the 101 Freeway.

34.  After **DIAZ** left, SA Kalies and Detective Freede
escorted CS2 away from the area.  At approximately 12:52 p.m.,
SA Kalies collected the digital audio/video recording
devices and audio recording/transmitting from CS2.  SA Kalies
and Detective Freede searched CS2's person and vehicle for
contraband, with negative results.  SA Kalies took custody of a
paper bag which contained three clear plastic baggies, each with
multiple blue pills inside from the rear passenger seat of the
CS' vehicle.

35.  CS2 was then debriefed concerning the narcotics
transaction and told SA Kalies and Detective Freede the
following:  CS2 received a call from **DIAZ**, who stated he was at
Target.  CS2 told **DIAZ** to meet at the Starbucks parking lot and
in a series of phone calls provided the location of the
Starbucks, which **DIAZ** was having trouble finding.  CS2 told **DIAZ**
that CS2 would stand outside CS2's vehicle, which CS2 told **DIAZ**
was a silver Nissan Xterra.  **DIAZ** then arrived in the Starbucks
parking lot in a teal BMW with a female passenger.  **DIAZ** exited
the BMW sedan and entered the passenger seat of the CS2's
vehicle.  **DIAZ** entered the vehicle with a paper bag which
contained three bags inside, each of which, **DIAZ** told CS2,
contained 1,000 pills.  CS2 provided **DIAZ** with money for the
pills and told **DIAZ** to count the money.  After the deal had
transpired, **DIAZ** informed CS2 that **DIAZ** could conduct large
transactions and that **DIAZ**'s source had 60,000 pills and that
**DIAZ** also had access to large amounts of methamphetamine.
During this conversation, a police car arrived and parked by

**DIAZ**'s vehicle.  **DIAZ** left CS2's vehicle and walked towards **DIAZ**'s vehicle, after which the female exited **DIAZ**'s and the two of them walked towards a Subway restaurant.  (At the February 23 drug deal, I observed that there was a Subway near the Jamba Juice that **DIAZ** and his female companion walked into after the deal.)

36.  On February 26, 2022, at approximately 3:05 p.m., **DIAZ** called CS2 to discuss the previous drug deal.  A Spanish-speaking agent familiar with this investigation listened to and translated the recorded call between **DIAZ** and CS2.  In summary, **DIAZ** told CS2 that the nearby police officer during the drug deal had made him nervous.  CS2 told **DIAZ** that CS2 was the one who should have been worried, since CS2 had possession of the drugs at that point.  **DIAZ** replied that **DIAZ** also had approximately 20 pounds of "mota," referring to marijuana, in his car during the deal.[3]

37.  On March 14, 2022, in Eastern District of California case number 22-sw-142, a magistrate judge in that district signed a warrant authorizing the search of **DIAZ**'s residence in Bakersfield, California, to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances).  That warrant was executed on March 16, 2022.

---

[3] Based on my training and experience I know that drug traffickers often use coded language when discussing illegal narcotics in an effort to elude the detection of law enforcement.  In this context, I know that "mota" is a slang term often used to describe marijuana.

**March 16 Meeting**

38.  On and before March 16, 2022, CS2 communicated with **DIAZ** at the number assigned to **TARGET DEVICE 1** and agreed to a larger drug deal on March 16, 2022.  In a series of communications leading up to March 16, **DIAZ** agreed to sell CS2 $236,250 of fentanyl and methamphetamine in two different transactions on the same day: 50,000 M30 pills and 30 pounds of methamphetamine for $127,500, and 50,000 M30 pills and 15 pounds of methamphetamine for $108,750.  **DIAZ** and CS2 agreed to meet in the city of Camarillo and ultimately decided on a movie theater parking lot in the vicinity of Camarillo, California.  All communications were monitored and preserved by law enforcement.

39.  On March 16, 2022, at approximately 9:49 a.m., SA Patrick Hazelwood and VCAT Detective Christian Freede met with CS2 at a neutral location.  During this meeting, they searched CS2 and CS2's vehicle for contraband, with negative results. They then outfitted CS2 with an audio recording and transmitting device as well as two audio/video recording devices.

40.  On March 16, 2022, at approximately 1:56 p.m., investigators saw a black Mitsubishi Eclipse, bearing California license plate number EDA9885, arrive at the meeting location. In the vehicle were **DIAZ** and two males later identified as **MARTINEZ** and **MENA**.  **MARTINEZ** was driving.  CS2 got out of his vehicle and met **DIAZ**, who stated that they needed to wait for another vehicle to arrive.  **DIAZ** returned to his vehicle, the

black Mitsubishi, and **DIAZ**, **MARTINEZ**, and **MENA** waited in the vehicle.

41.   At 3:34 p.m., investigators saw a white Dodge Challenger, bearing California license plate number 7TZM382, arrive at the meeting location.  In the vehicle were two males later identified as **FRANCISCO** and **DEJESUS**.  **FRANCISCO** was driving.  **FRANCISCO** parked the Challenger near the black Mitsubishi, exited and walked behind the Challenger and opened the trunk, and removed a bag that appeared to contain something heavy.  **FRANCISCO** then walked with the bag over to the black Mitsubishi Eclipse where **DIAZ**, **MARTINEZ**, and **MENA** were waiting and went inside the vehicle through the rear passenger-side door.

42.   At 3:44 p.m., the black Mitsubishi drove back near where CS2 was parked.  CS2 saw that the bag contained drugs.  (Investigators later searched the bag and found approximately 50,000 pills of suspected fentanyl contained in black and blue duffle bag.)

43.   At 4:15 p.m., investigators observed a silver Dodge Journey, bearing California license plate number U649GD, arrive at the meeting location.  In the vehicle were two males later identified as **GOMEZ** and **VARELA**.  **VARELA** was driving.  The Dodge Journey parked near the Challenger and the Mitsubishi, and **FRANCISCO** exited the Challenger and greeted **GOMEZ**, who was seated in the front passenger seat of the Dodge Journey.

44.   According to recorded communications, **DIAZ** indicated to CS2 that he was still waiting for another vehicle to bring the additional 50,000 M30 pills.

45.   A short time later, DEA agents and VCAT officers arrested all seven individuals: **DIAZ, MARTINEZ, MENA, FRANCISCO, DEJESUS, GOMEZ,** and **VARELA.**   In the trunk of the Dodge Journey (the vehicle **GOMEZ** and **VARELA** arrived in) investigators found approximately 45 pounds of suspected methamphetamine contained within three miscellaneous bags and 1 large brown cardboard box.

46.   Investigators seized the following 10 digital devices when the seven individuals were arrested:

a.   **TARGET DEVICE 1** was found on **DIAZ**'s person, seized from the Mitsubishi Eclipse's top center console when he was arrested.

b.   **TARGET DEVICE 2** was seized from **MARTINEZ**'s person when he was arrested.

c.   **TARGET DEVICE 3** was seized from **MENA**'s person when he was arrested.

d.   **TARGET DEVICE 4** was seized from **FRANCISCO**'s person when he was arrested.

e.   **TARGET DEVICE 5** was seized from front driver's seat of White Dodge Challenger.

f.   **TARGET DEVICE 6** was seized from the driver's side door of the black Mitsubishi Eclipse.

g.   **TARGET DEVICE 7** was seized from **VARELA**'s person when he was arrested.

h.   **TARGET DEVICE 8** was seized from the passenger floorboard of the silver Dodge Journey.

i.   **TARGET DEVICE 9** was seized from the driver side floorboard of the silver Dodge Journey.

j.   **TARGET DEVICE 10** was seized from the driver side floorboard of the silver Dodge Journey.

## TRAINING AND EXPERIENCE ON DRUG TRAFFICKING & DIGITAL DEVICES

47.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous coconspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug-trafficking organizations often send multiple individuals to larger drug deals, who each may serve different roles, including broker, delivery person, and security guards or "muscle" to protect the valuable drugs and proceeds of drug sales.  There are often multiple individuals who are tasked with protecting drugs and drug proceeds, based on strength in numbers.

c.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the

18

manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

       d.  Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various coconspirators tend to be ongoing until their arrest.  Communications between people buying and selling drugs take place by telephone calls and messages, such as email, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photographs or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photographs and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photographs to each other and others to boast about the drugs or facilitate drug sales. It is also common for drug traffickers to carry cell phones in order to remain in contact with drug suppliers or customers, to communicate with coconspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various coconspirators, and to coordinate the amount of drugs trafficked, as well as payment amounts and methods.  Based on my training and experience, I know that the above-described

information can be stored on digital devices carried by drug traffickers.

       e.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their persons and on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and coconspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and coconspirators involved in narcotics trafficking.

       f.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

       g.   In the case of drug couriers or those travelling with drugs or drug proceeds for protection and strength in numbers, cell phones or digital devices are also commonly used to communicate itineraries to couriers and provide directions to couriers along their route and once they arrive at their destination.

h.   To that end, I know that drug traffickers and drug couriers use cell phones to further various aspects of the drug trade.  Drug traffickers and drug couriers use cell phones to contact (by way of both voice call and electronic message) drug suppliers, customers, and coconspirators, all for the purpose of acquiring, storing, transporting, and distributing drugs. Drug traffickers also maintain, on their cell phones, records related to drug distribution (e.g., ledgers and notes pertaining to drug sales), and photographs of drugs, drug paraphernalia, and the instruments of the drug trade (including firearms).  Further, the location data associated with a drug trafficker's cell phones (which is often stored locally on cell phones) assists investigators in identifying the drug trafficker's residence, stash house, coconspirators, the residences of the trafficker's coconspirators, and meeting locations.

### TRAINING AND EXPERIENCE ON DIGITAL DEVICES

48.  As used in this affidavit, the term "digital device" includes the **TARGET DEVICES.**

49.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

50.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained

21

in the file does not disappear, rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

51.  Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them. For example, recoverable
data can include evidence of deleted or edited files, recently
used tasks and processes, online nicknames and passwords in the
form of configuration data stored by browser, email, and chat
programs, attachment of other devices, times the device was in
use, and file creation dates and sequence.

52.  The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

53.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

54.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

55.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

56.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photographs with an average size of 1.5MB.

57.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of
publicly available materials:

58.  Users may enable a biometric unlock function on some
digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

59.  In some circumstances, a biometric unlock function
will not unlock a device even if enabled, such as when a device
has been restarted or inactive, has not been unlocked for a
certain period of time (often 48 hours or less), or after a
certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

60.  The person who is in possession of a device or has the
device among his or her belongings is likely a user of the
device.  Thus, the warrant I am applying for would permit law
enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress the thumb and/or fingers of the person

who possessed the digital device on the digital device and
(2) hold the digital device in front of the person who possessed
it, with the person's eyes open to activate the facial, iris,
and/or retina-recognition features.

    61.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## CONCLUSION

62. For the reasons described above, there is probable cause to believe that **HOMERO L. DIAZ** (**"DIAZ"**), **MANUEL MARTINEZ-LUGO** (**"MARTINEZ"**), **APOLINAR MENA** (**"MENA"**), **KORA FRANCISCO-PLACENCIA** (**"FRANCISCO"**), **ANTONIO DEJESUS-SANTANA** (**"DEJESUS"**), **JAIME GOMEZ-LOPEZ** (**"GOMEZ"**), and **DANIEL VARELA-MACIAS** (**"VARELA"**), have violated 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the **TARGET DEVICES** described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __17th__ day of
__March__, 2022.

_____
THE HONORABLE PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE